200 P.2d 353

**STEWART v. SMITH et al.**

No. 5026.

Supreme Court of Arizona.

Dec. 6, 1948.

Croaff & Croaff and Frazier & Clark, all of Phoenix, for appellant.

Wilson & Wilson, of Phoenix, for appellees.

PER CURIAM.

This action grows out of a written contract to drill a water well, which reads:

"It is hereby understood that Arthur J. Stewart will drill an 8 inch diameter well for H. J. Smith at a site selected by the latter. All drilling equipment and labor will be furnished by Arthur J. Stewart.

"H. J. Smith agrees to pay for the drilling at the rate of $3.00 dollars per lineal foot for all soft formation and at rate of $8.00 dollars per lineal foot for all hard formation, excepting certain igneous and mineralized rocks.

"Wherever igneous or mineralized rock is encountered drilling may be discontinued or, at the option of H. J. Smith, drilling will continue, but at the rate of $7.50 dollars per hour.

"When drilling is discontinued payment in full will be made by H. J. Smith for all holes drilled and for all material used, whether water is found or not. All casing, pipe and material, other than drilling equipment, will be furnished by H. J. Smith at the well site.

"It is understood that the size of the drill hole may be enlarged or reduced should formations be encountered which make it necessary.

"Payment Schedule—in full at each 100 foot level.

"This contract is limited to 400 feet depth.

"Dated 7/17/1945."

Arthur J. Stewart, the well driller, as plaintiff, brought an action against defendants H. J. Smith and Anna E. Smith, his wife, to recover a claimed balance due of $2665.50 for services performed under the contract and for foreclosure of a laborer's lien. It was conceded that $2400 had already been paid on the contract. The answer of defendants admitted the execution of the contract, denied that the services had been performed in a satisfactory manner, alleged an overpayment of $1176, and by a "cross-complaint" set up: (a) That the overpayment alleged in the answer had been procured through the fraudulent representations of plaintiff, (b) that through the negligent operations of plaintiff the water vein allegedly discovered had been destroyed and lost to "cross-complainants" for which they sought damages in the over-all sum of $14,000. The case was tried to a jury and two general verdicts were returned, (1) "* * * for the defendants on plaintiff's complaint," (2) "* * * for the Defendants H. J. Smith and Anna E. Smith, his wife on the Defendants' cross-complaint and assess their damages in the sum of $2400.00 *or a new well, eight inches in diameter and four hundred feet deep.*" (The italicized portion of the verdict was subsequently stricken as being superfluous.)

Before trial the court had denied a motion to dismiss the "cross-complaint" as not stating a cause of action, and at the

close of all the evidence a motion for a directed verdict on the "cross-complaint," based upon a lack of competent evidence to support the verdict, was also denied. Thereafter, before entering judgment, the court denied motions to set aside the verdict and for judgment notwithstanding the verdict, a motion for a new trial and a supplemental motion for a new trial. Judgment was then regularly entered in accordance with the verdicts whereupon appellant gave timely notice of appeal both from the judgment and the whole thereof and from the denial of these various motions. For the sake of clarity we shall hereafter refer to the plaintiff, "cross-defendant" and appellant, as Stewart, and to the defendants, "cross-complainants" and appellees, as Smith.

Stewart presents some seven assignments of error covering nine pages of the abstract of record, which we shall not set forth either haec verba or in other form. They are all so inartfully drawn, being multifarious, repetitious and redundant, that it is extremely difficult to made "heads or tails" out of them, nor do we have the aid of any propositions of law as none were submitted as is required by our Rule VII 2 (e). Many of the errors complained of have to do with the trial court's rulings both on the sufficiency of the pleadings and on objections to some of the instructions given to the jury, as well as the denial of the various motions set forth in the preceding paragraph. We have concluded that this appeal may be effectually disposed of by treating as decisive the question of the sufficiency of the evidence to sustain the verdict rendered and judgment entered on the tort action set forth in Smith's "cross-complaint."

■ It is alleged by Smith both in the answer and the pleading designated "cross-complaint" that Stewart had, through the use of cement in the hole, negligently destroyed the flow of water found in the drilling of the well. As there is, in our opinion, no occasion under the rules of civil procedure now in effect in this jurisdiction to employ the use of the term "cross-complaint" (see sections 21-401 and 21-404, A.C.A.1939, Rules Civ.Proc., Rules 7(a) and 8(a) ), we shall treat this feature of the case as constituting a compulsory counterclaim, as provided for in section 21-437, A.C.A.1939, Rules Civ.Proc., Rule 13(a).

■ In order for Smith to recover damages for the alleged negligence of Stewart it was necessary for him to prove, by a fair preponderance of the evidence, three things: (1) That Stewart had struck a vein of water in the drilling operations, (2) that the flow of water thus found had been destroyed through the negligence of Stewart, and (3) that such negligence was the proximate cause of the damages he (Smith) had suffered. We first treat the proof adduced to support Smith's first contention. Stating the facts in the light most favorable to Smith, the prevailing

party, it is apparent that on the matter of discovering water he relies upon these things: (a) Stewart's statements made about December 1, 1945, to him and others that he had struck water and plenty of it at the 396 foot level, that it was coming in with such force it was washing in pebbles, and that Stewart then demonstrated he had water by bailing out some eleven bails of it (the evidence does not disclose the quantity of water measured in gallons); and (b) that water had been found in wells drilled by Harold Baxter, Bob Evans and Frank Lloyd Wright on their ranches some one and a half to four miles distant.

■ To properly understand this matter and to determine the sufficiency of the evidence introduced it is essential to set forth, from the testimony of the six experienced well drillers who testified, the modus operandi of the type of well drilling Stewart employed in this case. Carl Elliott Williams, a graduate in geology of Stanford University and a specialist on ground water, established the necessity for the use of water in well drilling operations:

"It is a physical impossibility to drill a well dry. You have got to put water in there so as to make the material that you are grinding with those bits into mud so you can bale it out. There is no instrument in the world that can go into a drilled hole and pick up dry sand or dry cuttings or dry clay, any of those formations unless they are wet."

The same witness explained how easy it was for even an experienced driller to be temporarily misled as to whether in truth and in fact a vein of water had been struck.

"* * * When you go out of solid into the shatter zone why you keep pouring water in there to try to get enough water in there to float your cuttings and the water goes on down deeper off to one side, and when you drill through this the water and mud accumulate back behind in the loose formation. And when you go back into the solid and start drilling on solid again this loose material and water come back into the hole. I don't think there are very many drillers who haven't been fooled on having water and find later they didn't have."

In answer to a question as to what he attributed the water in the well at that point, Stewart said:

"Well, we poured in sometimes as much as 30 or 35 gallons of water in the hole and drilled two or three feet. When we go to bale that out we only get four or five gallons. The rest of it going out in the crevices and cracks. And further down in the well there was probably a solid layer where the water drained, perforations, seeped down through there and got in this solid layer, stopped and accumulated in a pool in some of these crevices. When we got down to there we had what looked like a little water in the hole. When we got a little past through it, got the stuff baled, we didn't have any."

Stewart did not deny that he had informed both of the defendants and others that water had been encountered in the hole at the 396 foot level. However, he qualified it by stating that what he actually said was, "I think we are getting a little water," and he further stated " * * * I thought I did at one time but it soon proved otherwise." Irrespective of what Stewart may have said or thought, he either struck water or he did not, and surely it cannot be seriously contended that he could be held liable on the negligence aspect of the case if the statements made as to finding water later proved to be wholly inaccurate.

■ The specious argument that because others had found water in their drilling within a radius of four or five miles of the Smith place is proof that it should have been found in this well at practically the same level is hardly deserving of an answer. Such a contention could only be supported upon the assumption that there was a well defined underground water table in the foothill area of McDowell Mountain range where these drilling operations were being carried on. There is not a scintilla of evidence to sustain such a theory and it was doubtless to forestall such a claim that the drilling contract fails to provide any guarantee on Stewart's part that water would be found.

■ We now consider the second proposition advanced by Smith, i. e., that Stewart had negligently destroyed the flow of water found in the hole. Assuming that Smith's contention is correct that a vein of water was struck, would the pouring of a cement aggregate into the drill hole to stop "raveling" (a term applied to a shattered or broken rock formation that sloughs off and interferes with drilling operations) be an unusual or extraordinary course for a well driller to follow under the circumstances here shown? Stewart testified, and the testimony stands uncontradicted:

"I fought that hole for about a week trying to get through the spot, this area there of crevice rock which had broken up into small parts about the size of an egg. The action of the water we poured in, the drilling action there, kept bringing them into the hole. We couldn't get through them. We had to cement them to get through, which is a method they use all the time in wells. We have hundreds of times."

It was established by the testimony of all who had even the slightest knowledge of the art of well drilling that cementing is an accepted and usual practice in operations where a stratum of broken rock and gravel is encountered which tends to ravel.

Cementing a hole under these circumstances not being negligence per se, it follows that it was incumbent upon the plaintiff to establish by a fair preponderance of the evidence that Stewart, in doing what he did, was guilty of some act of commission or omission that would constitute negligence. In the case of Owl Drug Co. v. Crandall, 52 Ariz. 322, 80 P.2d

952, 954, 120 A.L.R. 1521, we defined negligence as:

" 'The failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or the doing what such a person under the existing circumstances would not have done. Baltimore & P. R. Co. v. Jones, 95 U.S. 439, 441, 24 L.Ed. 506.' Bouvier's Law Dict. [Rawles Third] Rev., p. 2312."

To prove negligence in the use of cement it is apparent from the record that Smith relies almost entirely upon the testimony of one Charles Wheeler, a cook in his employ, who testified to the following statement made by Stewart relative to pouring cement down the well:

" * * * He said that all those pebbles and rocks that were washing in with the water were getting alongside of his drill and making it stick so he said he would have to pour cement in there in order to keep those pebbles out; otherwise there would danger of sticking his bit and not being able to get it out. I asked him if there wasn't some possibility of sealing up the water; and he said, 'Yes, there was some.' But he didn't think it was very great. And he said he would take a chance."

All of the testimony introduced in favor of Stewart on this point goes to prove the improbability, if not the impossibility, of sealing off a vein of underground water by the use of cement in a drill hole. We quote from the testimony of Carl Elliott Williams on cross-examination:

"Q. You seal off some water you don't want? A. I don't know as we have used it for sealing off water. We use it only to hold up the broken rock that is trying to fall into the hole.

"Q. But it will seal off water, isn't that what you said? A. I don't believe I said that.

"Q. Would you say it now whether it will or whether it won't? A. I question very much in an open hole if you do the concrete job under ground that it would be water tight.

"Q. It wouldn't be water tight? A. I question that very much.

"Q. What happens to the concrete when it gets underground which prevents it from being water tight? A. You would have to fill every little fissure every little vein there is in there to be able to make it water tight. I don't think that is possible.

"Q. Isn't it true that if you got a hole down in the ground and the hole might look something like this, it is more or less round, and has got an end on it as far as you drilled down somewhere; and suppose that your fissure, or fault or whatever it is, came through here; suppose you dump in five sacks of cement mixed with some sand and filled the hole up to here. This would be solid cement, wouldn't it? A. Yes, solid cement.

"Q. Do you think it would seal off this water coming in here and here? A. I question that very much. When you put a ton and a half of drill tools in there and start drilling the cement would break back out, because when you start hitting that cement with a string of tools which weigh a ton or more that cement will be pretty well cracked.

"Q. The cement would all come out? A. You cement the boulders that are trying to fall in there, *you don't make a water seal of it."* (Emphasis supplied)

Smith offered no competent testimony to the contrary, his only evidence on the matter being the heretofore quoted statement made by Wheeler as to his conversation with Stewart.

It is also Smith's complaint that he was not consulted by Stewart about the use of cement and hence did not have the opportunity to either object or consent thereto. As to this, Stewart stoutly maintains, and we think correctly so, that he was under no obligation to consult with Smith as to methods pursued in actual drilling operations, though he testified that he believed Smith was present when the cementing process was talked of or at the time it was poured.

Viewing the matter in its entire light we are impelled to the conclusion that the evidence falls far short of establishing either that a vein of water was actually found, or even assuming that it had been found, that Stewart's use of cement in the hole was such a negligent operation as to entitle Smith to go to the jury on this question. There being a failure of proof of negligence, it is unnecesary to consider either the question of proximate cause or of damages. We hold, therefore, that the trial court was in error in not granting Stewart's motion for a directed verdict and later for not granting Stewart's motion for judgment notwithstanding the verdict on this tort phase of the counterclaim.

■ With the negligence action out of the way, the question arises as to the disposition to be made of the suit on the contract. The matter of overpayment was set up both in Smith's answer and by way of counterclaim, and had the case been submitted to the jury under special verdicts and interrogatories or a general verdict accompanied by answers to interrogatories, we would probably be in a position to dispose of the entire case. As it is, however, unless we indulge in speculation and conjecture there is no way of determining what portion of the $2400 verdict on the counterclaim is attributable to the tort action and what amount, if any, of overpayment the jury found had been made. Had the verdict been for $1176 (the amount sued for in the counterclaim under the contract), or any lesser amount, a method of legally sustaining the verdict and judgment thereon could perhaps be found, but we have no occasion for making a pronouncement on this abstract question and to do so would only

result in dicta. The verdict being indivisible, the entire action on the contract must be retried, for before the jury can decide whether there has been an overpayment the total amount earned by Stewart must be determined. It seems to us that in order for justice to be done on a retrial there are issues of fact the decision of which are necessary to a verdict. For example: What was the number of feet of "soft" and of "hard" formation encountered in the drilling operations? Was any igneous or mineralized rock encountered, and if so at what level? Did Stewart notify Smith of this fact, and did the latter exercise his option of determining whether the drilling should continue on an hourly basis? If such direction was in fact given, how many hours did Stewart drill thereafter? What over-all depth was reached? If this depth exceeded 400 feet, what agreement was reached between the parties as to compensation beyond the depth called for in the written contract? All these and possibly other questions are crying for an answer. Hence on the retrial the matter should be submitted to the jury under the provisions of sections 21-1008 or 21-1009, A.C.A.1939.

The judgment is reversed and the cause remanded to the trial court with directions (a) to dismiss the tort action set forth in the counterclaim based upon the alleged negligence of Stewart, and (b) to grant a new trial upon the contract issue raised by Stewart's complaint and Smith's answer and the issue of overpayment presented by the counterclaim.

Reversed and remanded with directions.

STANFORD, C. J., and LaPRADE and UDALL, JJ., concur.